## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| FRANK TROUT, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 12 C 3504 |
| ) | |
| VILLAGE OF WESTMONT, a ) | Judge Rebecca R. Pallmeyer |
| Municipal Corporation, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Frank Trout was the Fire Chief for the Village of Westmont until January 17, 2012, when he was terminated for misconduct. Following his termination, Trout brought this action, alleging that the Village owes him unpaid compensation under the Fair Labor Standards Act and related state law guarantees, and under the terms of a contract between Trout and the Village. The court earlier granted judgment on the pleadings in favor of the Village officials Trout had named as Defendants in their individual capacity. [Order of March 13, 2013 [22].) The Village now seeks summary judgment. Because Trout was exempt from the protections of FLSA, as explained below, the court grants summary judgment in favor of the Village on that claim. The court concludes his contract claim fails, as well, because Trout himself terminated the agreement.

## FACTS

The Village's motion for summary judgment is supported by a Statement of Uncontested Facts, including citations to the record, as required by our Local Rule 56.1 (*See* Def.'s 56.1 Stmt. [35].) That Rule directs the non-moving party to respond and to include, for any disputes, a citation to the record in support of the non-moving party's position on that issue. Plaintiff Trout, who is represented by counsel, has submitted a responsive statement pursuant to LR

56.1(b)(3) [45], but has not supported his denials with record citations in all instances. In any event, as set forth here, the facts are largely undisputed.

Plaintiff Trout worked as the Fire Chief for the Westmont Fire Department from January 5, 1993 until January 17, 2012. (Plaintiff's Response to Def.'s 56.1 Statement [45] ¶ 7.] During Trout's tenure, Raymond Botch served as Village Manager until October 1, 2003, and Ronald Searl became Village Manager (initially in an acting capacity) thereafter. (*Id.* ¶¶ 4, 5.) Before becoming Chief, Trout worked for the Westmont Fire Department as a "paid on call" fire fighter beginning in 1989 and as Deputy Chief and Administrative Officer beginning in 1990. (*Id.* ¶ 8.)

In 1995, the Village established the "Duty Officer" program, a program that required that one officer be assigned to be on call for a shift at all times. The Duty Officer was expected to remain within a three-mile radius of the Village during his shift in order to respond promptly to serious emergencies or alarms, inspect buildings and equipment, meet with fire fighters to plan shift work, and oversee training. (*Id.* ¶¶ 9, 10, 13.) The only employees eligible to serve as Duty Officer were the Fire Chief, Deputy Chiefs, and Captains and, at least on some occasions, the Department's Administrative Director and Fire Prevention Bureau Director. (*Id.* ¶ 11; Plaintiff's Statement of Additional Facts [45, pages 19-20] ¶ 1; Exhibits A, B.) An officer assigned to a Duty Officer shift could be on or off duty in his primary capacity, as well; no individual was employed solely to serve as Duty Officer. (Def.'s 56.1 Stmt. ¶¶ 11, 12.) The Village currently classifies the Fire Chief as an exempt employee, not eligible for additional compensation for hours worked as Duty Officer, but classifies the Deputy Chiefs and Captains as non-exempt employees who do receive additional compensation for those hours. (*Id.* ¶ 14.) (Plaintiff disputes this but cites no record evidence to rebut it. (Trout's Response to Def.'s 56.1 Statement ¶ 14.).)

**Plaintiff's Responsibilities**

As Fire Chief, Plaintiff was the highest-ranking officer In the Fire Department. (Def.'s 56.1 Stmt ¶ 17.) In that capacity, Plaintiff was responsible for significant management responsibilities:

- Planning and direction of activities and services for fighting fires, for providing emergency services, for enforcing the Fire Prevention Code, and for education and public awareness

- Creation and revision of department policies

- Direction of equipment and manpower in response to emergency medical and rescue calls

- Serving as Duty Officer when necessary

- Inspecting buildings for code compliance

- Representing the Village at meetings with boards of three fire districts

- Attending and representing the Fire Department at meetings of the Village Board of Trustees and the Village Planning & Zoning Commission

- Supervision of approximately 110 employees, including an Emergency Medical Services Director, the Fire Prevention Bureau Director, Administrative Director, and Deputy Chief of Administration

- Conducting interviews for hiring and promotion, and recommending hiring, promotion, and termination decisions

- Directing and planning the work of subordinates, including scheduling their work hours, vacation time and compensatory time, and assuming responsibility for their safety

- Conducting performance evaluations, conducting employee training, and imposing formal discipline[1]

- Oversight and management of the Fire Department's inventory and inspection of its equipment

- Preparation and management of the Department's budget

(Trout's Response to Def.'s 56.1 Stmt. [45 ] ¶¶ 17-27.)

---

[1] Plaintiff disputes that he had disciplinary authority, but this statement is supported by his deposition testimony and he cites no record evidence to rebut it. (Plaintiff's 56.1 Response ¶ 23; *but see* Trout Dep. at 40-41, Exhibit 4 to Def.'s 56.1 Stmt.)

3

Plaintiff acknowledges that the Village manager "rarely if ever visited" the fire stations to scrutinize his management activities. (*Id.* ¶ 28.) He does assert that certain of his supervisory responsibilities were curtailed, but the evidence does not support that suggestion. Thus, he asserts that Village Manager Searl prohibited him from issuing discipline (Plaintiff's Statement of Additional Facts ¶ 9)—but the document he cites is a June 17, 2009 memorandum from Searl imposing a disciplinary suspension on Plaintiff himself for offensive speech made at a Memorial Day parade in Plaintiff's official capacity. Searl was concerned about Plaintiff's public statements "condemn[ing] the actions of the President, Federal Government in general, single unwed mothers as well as gays." (Searl Memorandum, Exhibit 7 to Plaintiff's Statement of Additional Facts.) The disciplinary suspension Searl imposed as a result did not permanently strip Plaintiff of the power to issue discipline; it simply prohibited him from "initiat[ing] any command decisions or instructions to [his] staff" for a five-day period. (*Id.*) Notably, the memorandum recognized that "As [Plaintiff was] an exempt employee this suspension is with pay." (*Id.*) Plaintiff also asserts that he is "unable to independently authorize small purchases . . . such as holiday card purchases." (Plaintiff's Statement of Additional Facts ¶ 10.) Again, however, the document he cites, a November 29, 2011 memo from Searl to "All Department/Division Heads" says nothing of the kind; it simply announced that due to budget constraints, "no village funds are to be used in the purchase and/or distribution of holiday cards . . . ." (Nov. 28, 2011 memorandum, Exhibit 8 to Plaintiff's Statement of Additional Facts.)

**Duty Officer Pay**

Working as Duty Officer was one of Plaintiff's most important responsibilities as Fire Chief. (*Id.* ¶ 31.) The job description for Fire Chief—which Plaintiff himself reviewed and revised, and acknowledged was accurate--included "serving as the Duty Officer when necessary" as one of the essential duties of the position. (*Id.* ¶¶ 30-32.) Plaintiff testified that he covered the Duty Officer shift when there was a vacancy on the Duty Officer schedule and/or

4

no other eligible employee was willing to cover the shift (*id.* ¶ 29)[2], remaining in charge of the Fire Department at the same time. (*Id.* ¶ 34.)

Plaintiff was classified as a salaried, exempt employee. (*Id.* ¶ 35.) In 1995, when the Duty Officer program was created, and for several additional years, the Village did not pay him any additional compensation beyond his salary for the hours he worked as Duty Officer. (*Id.*) Beginning in 2001, however, Plaintiff wrote to then-Village Manager Raymond Botch, asking for additional compensation for the Duty Officer assignment. (*Id.* ¶¶ 36, 37.) Botch agreed, and with the consent of the Public Safety Committee and the Village Board of Trustees, made the decision to pay Plaintiff one hour of pay for every three hours worked as Duty Officer outside his normal shift. (*Id.* ¶ 38; Botch Affidavit, Exhibit 3 to Trout's Response to Def.'s 56.1 Stmt, ¶ 14.) Craig Skala, the Administrative Officer for the Fire Department, confirmed the arrangement in a February 25, 2003 letter to Ronald Searl, and Plaintiff began receiving the additional compensation beginning in March 2003. (*Id.* ¶¶ 39, 40.)

The Village of Westmont's Municipal Code provides that members of the Fire Department will be paid "such compensation as may be set from time to time by the village board," and that the salaries of all Village employees "shall be established by approval of the annual budget and appropriation ordinance." (*Id.* ¶¶ 42, 43.) The Code vests in the Village Manager the authority to hire and fire employees "at such compensation as may be set or authorized by the village board." (*Id.* ¶ 44.) It appears undisputed that there was no meeting of the Board of Trustees, with a quorum present, at which the Board approved the additional compensation Botch had approved, nor any other "official action" authorizing it, but Plaintiff contends that Botch's agreement to pay him additional amounts for his Duty Officer shifts is binding on the Village. (*Id.* ¶¶ 45, 46.)

---

[2] Plaintiff now disputes this, but he so testified. (Trout Dep. at 38-39.) And the testimony he cites as establishing a dispute of fact states only that his ordinary work shift was from 8:00 a.m. to 4:00 p.m. (Plaintiff's Response to Def.'s 56.1 Stmt. ¶ 29, citing Trout Dep. at 30, 38-39.)

5

When Plaintiff's employment with the Village ended in January 2012, his salary was $125,289.84, making him the highest-paid employee in the Fire Department by a substantial margin: The next-highest paid employee in the Department earned $98,216.04. (*Id.* ¶ 58.) Thus, all other employees who served as Duty Officer earned substantially less than Plaintiff. (*Id.* ¶¶ 58, 59.) For example, Craig Skala, the Department's Administrative Director, and Doug Daniels, the Fire Prevention Bureau Director, who were classified as exempt employees but paid separately for their Duty Officer shifts, earned just $88,380.24 and $73,210.80, respectively. (*Id.* ¶ 58; Plaintiff's Statement of Additional Facts ¶ 1.)

**Plaintiff Voluntarily Relinquishes Duty Officer Compensation**

In September 2005, Ronald Searl became Acting Village Manager. (Plaintiff's Statement of Additional Facts ¶ 4.) Concerned about the Village's finances, Searl met with Plaintiff to discuss budget concerns. (*Id.* ¶ 5; Def.'s 56.1 Stmt. ¶ 52.) Plaintiff, who had been warned by the Finance Director, Bonnie Owens, that Searl believed Plaintiff was overpaid, made several proposals to reduce expenses in the Fire Department budget. (Plaintiff's Statement of Additional Facts ¶ 6; Def.'s 56.1 Stmt ¶ 52.) Relinquishing pay for his Duty Officer shifts was among these. Plaintiff claims he believed he would be fired if he continued receiving pay for Duty Officer shifts. (Plaintiff's Statement of Additional Facts ¶ 7.) Accordingly, Plaintiff told Searl that he "would not be accepting duty officer salary" going forward. (Def.'s 56.1 Stmt. ¶ 49, citing Trout Dep. at 33.) Searl did not order, direct, or encourage Plaintiff to relinquish the additional compensation. (Def.'s 56.1 Stmt. ¶ 51.) And, as Plaintiff notes, no Village official ever told him he was not entitled to additional pay for Duty Officer work outside his regular shifts. (Trout Aff., Exhibit 6 to Plaintiff's Statement of Additional Facts, ¶ 5.) Plaintiff confirmed his own decision on this issue in a letter dated September 22, 2005 that he drafted, in which he stated, "Confirming our conversation of yesterday I would be willing to concede my duty officer's pay without reducing the additional time that I devote to that function while the village is in

6

drastic financial straits. . . . . I would regard this as my personal contribution towards supporting you and my village." (*Id.* ¶ 50; Trout Dep. at 55.)

Defendant asserts that on December 26, 2005, Plaintiff stopped submitting payroll requests for additional compensation, but cites no evidence in support of this assertion other than its Answer. (Def.'s 56.1 Stmt. ¶ 53.) Plaintiff, for his part, asserts that he did continue to submit timesheets for Duty Officer work until he left his position with the Village, but he cites nothing at all in support. (Trout's Response to Def.'s 56.1 Stmt. ¶ 53.)[3] It is undisputed, however, that beginning on January 8, 2006, the Village ceased paying Plaintiff for serving as Duty Officer for shifts when he was not assigned to work as Chief. (*Id.* ¶ 54.) It is also undisputed that the Village Board took no official action concerning Plaintiff's decision to relinquish additional compensation for his hours as Duty Officer. (*Id.* ¶ 56.)

Plaintiff was terminated from his position in January 2012 for reasons including a traffic incident in which he was charged with DUI, his statements at the Memorial Day parade, and his off-duty patronage of Village establishments in his official vehicle. (*See* Order of 3/27/2013 [22] at 3, citing Plaintiff's Complaint.) In this lawsuit, Plaintiff seeks compensation for "as much as an additional 1900 hours" of work for shifts in which he served as Duty Officer but was not also on duty for his regularly-scheduled Monday through Friday shift as Fire Chief. (Def.'s 56.1 Stmt. ¶ 60; Plaintiff's Statement of Additional Facts ¶ 3.) He asserts that "the Duty Officer position is an hourly position under the Fair Labor Standards Act," but cites no support for that legal conclusion. To the contrary, the material he cites demonstrates that the Village did not compensate staff for every hour worked, as would be required for positions covered by FLSA.

---

[3] In his Memorandum of Law in response to the motion for summary judgment, Plaintiff asserts that he "continued to submit time sheets for his work as Duty Officer thereafter with a notation 'no pay at this time' to preserve his right to be paid for the separate job of Duty Officer." (Plaintiff's Response to Defendant, Village of Westmont's Motion for Summary Judgment and Brief in Support Thereof [43], at 3.) He cites "Pl. Fact ¶ 8," but neither paragraph 8 of his response to Defendant's Rule 56.1 Statement nor paragraph 8 of his own Statement of Additional Facts makes any mention of time sheets.

(Plaintiff's Statement of Additional Facts ¶ 2, citing Botch Affidavit ¶ 9.) Nor does the material cited by Plaintiff support his assertion that the "position of Duty Officer is a separate and distinct job in the Village's Fire Department" (Plaintiff's Statement of Additional Facts ¶ 14); as noted, no individual was separately hired for that position, which was instead a supervisory assignment carried out by eligible officers. The fact that the position is "identified separately in the Fire Department organizational chart" (*id.* ¶ 21) does not suggest otherwise.

## **DISCUSSION**

Trout's claims present two significant legal disputes: First, was Trout entitled to compensation for the Duty Officer shifts under the Fair Labor Standards Act and related state law guarantees? Second, was the Village contractually obligated to pay Trout for those shifts? The court has little difficulty concluding that the answer to both questions is "No."

**Trout was Exempt from FLSA and IMWL Coverage**

The Fair Labor Standards Act requires employers to pay a minimum wage for a 40–hour workweek and additional overtime pay for all hours worked in excess of 40 hours a week. See 29 U.S.C. §§ 206–07, 213; *see also Kasten v. Saint–Gobain Performance Plastics Corp.*, ___U.S. ___, 131 S. Ct. 1325, 1329 (2011). Puzzlingly, Plaintiff concedes he is not seeking overtime pay in this lawsuit, yet it appears undisputed that he was paid his full salary, which presumably compensated him fully for his regularly-scheduled full-time assignment. (Plaintiff's Response to Def.'s 56.1 Stmt. ¶ 61.) To the extent he now suggests that the Fair Labor Standards Act imposed on the Village an obligation to pay him for some fraction of his additional Duty Officer assignment, the Village has established that he is exempt from FLSA protections.

The FLSA includes an exemption for any employee "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). The burden falls on the employer to prove that an employee is exempt under FLSA, *see Schaefer–LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 (7th Cir. 2012); *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 628 (7th Cir. 2010), and such exemptions are to be narrowly construed against the employer

8

seeking the exemption. *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505 (7th Cir. 2007). Where the undisputed facts establish that an exemption applies, however, the employer is entitled to summary judgment. *See, e.g., Blanchar v. Standard Ins. Co.,* 736 F.3d 753 (7th Cir. 2013); *Conroy v. City of Chicago,* 644 F.Supp.2d 1061 (N.D. Ill. 2009). To establish that an employee falls within the exemption for executive work, the employer must establish that the employee earns at least $455 per week, that his primary duty is management, that he directs the work of two or more other employees, and that he has the authority to hire or fire employees or make recommendations on their hiring, firing, or discipline. 29 C.F.R. § 541.100(a).

The undisputed facts establish that each of these elements is met. Plaintiff's salary substantially exceeded $455 per week. He directed the work of more than 100 employees. He interviewed potential hires and made recommendations concerning their hiring and discipline. And his primary duty involved performing exempt activities—i.e., activities related to the "management of the enterprise . . . or of a customarily recognized department or subdivision thereof . . . ." 29 C.F.R. § 541.100(a)(2). The relevant regulation identifies management duties as including

> activities such as interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment, or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures

.
5 C.F.R. 551.104. The list of Plaintiff Trout's job duties, set forth above, demonstrates that he performed all of these enumerated management functions. Neither the five-day disciplinary suspension nor the holiday gift card restriction creates any disputes of fact on this issue. The disciplinary suspension kept him away from his supervisory responsibilities for five days, not

9

permanently. And the fact that Plaintiff was advised, along with all other department heads, of financial constraints that precluded purchase of holiday cards arguably confirms that he was responsible for budget management.

The Village has established, as well, that management of the Fire Department was Plaintiff's primary duty. *See* 29 C.F.R. § 541.700(a) (relative importance of an employee's managerial duties as compared with other work, exercise of discretionary authority, freedom from supervision, and a significantly higher wage, militate in favor of the conclusion that management is the worker's primary duty). Plaintiff was the only fire chief, he was the highest-ranking officer in the Fire Department, and, even on those occasions when he served as Duty Officer outside his ordinary shift hours, Plaintiff remained in charge of the Fire Department. Even if that were not true, the evidence establishes that Plaintiff's work as Duty Officer constituted only a fraction of his working hours. He asserts, without explanation or records, that he devoted "up to 1900 hours" to that assignment, presumably since 2006 when he stopped receiving compensation for Duty Officer shifts. From 2006 through his termination in 2012, however, Plaintiff's full-time assignment occupied him for 12,000 hours, assuming a 40-hour work week for 50 weeks of the year. Duty Officer assignments did not transform Plaintiff's position to something other than management.

Plaintiff Trout is exempt from the protections of the Fair Labor Standards Act. His claim under the Illinois Minimum Wage Law is governed by the same standards. See 820 ILCS 105/4a (West 2004); *Resurrection Home Health Services v. Shannon,* 2013 IL App (1st) 111605, 983 N.E.2d 1079, 1086 (Ill. App. 1st Dist. 2013). Counts II and III of the Second Amended Complaint are dismissed.

**Trout Relinquished any Contractual Right to Duty Officer Shift Pay**

Even if the fair pay laws do not support his claim to payment for his Duty Officer shifts, Plaintiff contends the Village entered into an agreement, through its former Village Manager Raymond Botch, to pay him for those shifts. He invokes the Illinois Wage Payment and

Collection Act, 820 ILCS 115/2, which recognizes a claim for prompt and full payment of wages owed to workers at the time their employment ends. The Village challenges this argument on two grounds: the Village argues that no such agreement exists or, if it did, that Plaintiff waived his right to enforce that agreement.

The Village's first argument relies on language of the Illinois Municipal Code, the Village's own ordnances, and the Illinois Open Meetings Act, 5 ILCS 120/1 *et seq*. As the Village reads those provisions, they bar Plaintiff's claim for Duty Officer shift pay because Raymond Botch, the former Village Manager, did not proceed through these channels before making a commitment to pay Plaintiff additional amounts for Duty Officer shifts. Raymond Botch's affidavit states that he "hired Frank Trout as a Duty Officer" and agreed that he would be paid "in the same manner as other Duty Officers." Botch states that he did so with "acknowledgement and consent of the Public Safety Committee and the Board of Trustees" and the approval of the Village Board. (Botch Affidavit, Exhibit 3 to Trout's Response to Def.'s 56.1 Stmt, ¶¶ 13, 14.) Botch presents no dates or other specifics concerning the approval of these public bodies and says nothing about the Open Meetings Act. The Village, for its part, has not explained whether it met these formalities with respect to the payments it makes to other officers for Duty Officer shifts. The Village similarly has not stated why, if formal approvals were required but not provided, Trout did receive the additional pay for two years. Nor has either party presented evidence that the Village routinely does (or does not) comply with the statutory procedures for other employment arrangements, or whether the Village ordinarily honors commitments made by the Village Manager, even where those formalities are ignored. The court concludes there is a dispute of fact concerning whether Botch's 2003 commitment to make the additional payments to Plaintiff was enforceable.

What is not disputed, however, is that Plaintiff himself brought the arrangement to an end. When Ronald Searl became Village Manager in 2005, the Village's finances were tight. Plaintiff was aware of this and indeed was concerned that Searl believed Plaintiff was overpaid.

11

In this context, it is not surprising that Plaintiff, an exempt employee earning far more than any other Fire Department employment, volunteered to relinquish pay to which he was not otherwise entitled under the law. Plaintiff admits that no Village official pressured him to make this decision or spoke to him about it. In a letter confirming his own proposal, Plaintiff stated he was willing to forego the additional pay "while the Village is in drastic financial straits." Thus, he now suggests, the arrangement was a "temporary suspension only." (Plaintiff's Response [43], at 13.) Putting aside the fact that Plaintiff offers no evidence that the Village's finances have improved, the circumstances do not support the notion that he retained a unilateral entitlement to demand Duty Officer pay at any time. He asserts, without any evidentiary support, that he continued to submit timesheets for his Duty Officer work. Yet he evidently was not paid for that work from 2006 on, and from what appears in the record, never declared the "agreement" back in force until after his termination in 2012.

The Village argues that Plaintiff has waived any right he had to enforce the commitment Village Manager Botch made, and this court agrees. Waiver may be manifested expressly, as Plaintiff did when he relinquished his claim to Duty Officer pay orally and in writing. Waiver can also arise by acts, words, or conduct, including, in this case, conduct inconsistent with an intent to enforce the right. *Vaughn v. Speaker*, 126 Ill.2d 150, 533 N.E.2d 885 (1988), cited in *Ciers v. O.L. Schmidt Barge Lines, Inc.,* 285 Ill.App.3d 1046, 675 N.E.2d 210 (Ill. App. 1st Dist. 1996); *Sexton v. Smith,* 112 Ill.2d 187, 492 N.E.2d 1284 (1986). Plaintiff served Duty Officer shifts for years, as required by his job description, and was not paid for the work. So far as this record shows, he took no action concerning the matter until after his termination. Plaintiff's conduct in this case suggests he himself did not believe the agreement to pay him for additional hours, on top of his handsome salary, was enforceable. The Village is entitled to summary judgment on Count I as well.

**CONCLUSION**

Defendant's motion for summary judgment [34] is granted. Judgment will be entered in favor of the Village. As Plaintiff's amended complaint states no claims against the individual Defendants, the Clerk is directed to terminate the case as against them, as well.

ENTER:

Dated: September 23, 2014

*[signature]*

United States District Judge